## IN THE UNITED STATED DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

CIVIL ACTION NO.

**JOSEPH E. GOMEZ III,**
Plaintiff,

**v.**

**SAM'S CLUB, INC.** a/k/a **SAM'S WEST, INC.,** an Arkansas Corporation;
and
**WAL-MART STORES, INC.** a/k/a **WAL-MART, INC.** an Arkansas Corporation.
Defendants.

---

### COMPLAINT and JURY DEMAND

---

The Plaintiff, Joseph E. Gomez III, by and through his attorney, Amy Jane Simons, for his complaint against the Defendants, Sam's Club, Inc. a/k/a Sam's Club West, Inc. and Wal-Mart Stores, Inc. a/k/a Wal-Mart, Inc. states as follows:

### INTRODUCTION AND NATURE OF THE CASE

The subject matter of this case is the employment relationship between Plaintiff, Joseph E. Gomez III, and Defendants, Sam's Club, Inc. a/k/a Sam's Club West, Inc. and its parent company Wal-Mart Stores, Inc. a/k/a Wal-Mart, Inc. and Plaintiff's constitutional rights to due process of law based upon his property interest in expected and continued employment. This action arises under Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act of 1990, and Title I of the Civil Rights Act of 1991 to correct unlawful employment practices on the basis of religion and religious discrimination, disability and/or perceived disability, age discrimination, racial discrimination, hostile work environment, retaliation, and to provide appropriate relief to Plaintiff, who was adversely affected by these practices.   As set out in detail in the following paragraphs of this Complaint, Plaintiff was hired with Defendants' knowledge that he was a Pastor and would not have Sunday availability to work for Defendants.  Plaintiff was continually harassed and subjected to discrimination by his employer and supervisors, and passed over for promotions and management positions based primarily on his Sunday availability and partially on his racial background.  Defendants behaved in bad faith, spoliated relevant evidence, created a hostile work environment, and engaged in a pattern of discrimination against Plaintiff.  When Plaintiff brought his concerns to the attention of corporate management, he was subjected to further discrimination, a more hostile work environment, and retaliation.

### PARTIES

1.      Plaintiff, Joseph E. Gomez, III, is now and was at all times relevant, an individual of

Hispanic origin, residing in Jefferson County, Colorado.  Plaintiff is a Pastor and a devout Christian.  He has been employed by Defendant, Sam's Club, Inc. a/k/a Sam's West, Inc. a subsidiary of Wal-Mart Stores, Inc., a/k/a Wal-Mart, Inc. for almost seventeen years with this employment commencing on or about December 20, 1999.  He currently works at Sam's Club store #6632, located at 505 S. Broadway, Denver, Colorado  80209.

2.      Defendant, Sam's Club, Inc., a/k/a Sam's West, Inc., is an Arkansas Corporation, qualified to do business in Colorado.  At all times relevant, Defendant has been registered with the Colorado Secretary of State as a legitimate business conducting business within the State of Colorado.

3.      Defendant, Wal-Mart Stores, Inc., a/k/a Wal-Mart, Inc., is an Arkansas Corporation, qualified to do business in Colorado.  Defendant is the parent company of Defendant Sam's Club, Inc. a/k/a Sam's West, Inc.  At all times relevant, Defendant and its subsidiaries have been registered with the Colorado Secretary of State as legitimate businesses conducting business within the State of Colorado.

4.      At all times relevant, Defendants have continuously employed at least 15 individuals. Defendants have employed in excess of 500 employees in each of 20 or more calendar weeks in all years relevant to this Complaint.

5.      At all times relevant, Defendants have continuously been employers engaged in an industry affecting commerce, within the meaning of §§7(b), (g), and (h) of Title VII, which is found at 42 U.S.C. §§2000E(b), (g), and (h).

## JURISDICTION and VENUE

6.      Jurisdiction is proper in this Court because this civil action alleges discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, *et seq.* (Title VII"); the Americans with Disabilities Act of 1990, 42 U.S.C. §12101, *et seq.;* and §102 of the Civil Rights Act of 1991, 42 U.S.C. §1981a.  The Court has jurisdiction of these claims, pursuant to 28 U.S.C. §451, 28 U.S.C §1331 and 28 U.S.C §1343.

7.      The employment practices, discrimination, harassment, retaliation, unethical behavior, ridicule, lack of promotions within this store and others under the corporate umbrella, lack of store/company recognition for goals achieved and exceeded, unfair lack of raises and benefits, spoliation and defamation alleged herein arose and were committed in the State of Colorado, within the jurisdiction of the United States District Court for the District of Colorado.  Venue is therefore proper in this Court pursuant to 28 U.S.C. § 1391(b).

## ADMINISTRATIVE PROCEDURES

8.      On or about April 16, 2013, Plaintiff filed a charge of employment discrimination with the Denver office of the United States Equal Employment Opportunity Commission (EEOC), Charge No. 541-2013-01272.  Plaintiff alleged that the unfair and discriminatory treatment he received in the workplace caused him to suffer emotional and financial duress,

loss of income opportunities, loss of advancement opportunities, physical disability and physical disability exacerbation.

9.      On or about March 6, 2015, Plaintiff filed a second charge of employment discrimination with the Denver office of the United States Equal Employment Opportunity Commission (EEOC), Charge No. 541-2015-01774, alleging further discrimination by his employer.

10.     On or about May 12, 2016, Plaintiff made a written request to the EEOC for a Right to Sue, on Charge No. 541-2013-01272 and Charge No. 541-2015-01774.

11.     On or about June 8, 2016, the EEOC sent Plaintiff and Plaintiff's Counsel a Notice of the Right to Sue letter on Charge No. 541-2015-01774 and Charge No. 541-2013-01272.  A copy of the Notice of the Right to Sue letter is attached as Exhibit A to this Complaint.

12.     Plaintiff and Plaintiff's Counsel received the Notice of the Right to Sue letter on Charge No. 541-2015-01774 and Charge No. 541-2013-01272 on or about June 11, 2016.

13.     Plaintiff alleges that Defendants had racially and religiously discriminated against him by continuously overlooking his applications for advancement in the company, at the location where he has worked and at other locations where he could transfer.  This occurred despite Plaintiff's continued outstanding performance levels of exceeding quotas and sales levels, of experience in the positions for which he had applied; and his having temporarily held the positions for which he had applied for an interim time until they were filled by Caucasians who were less experienced and/or newly hired from outside the company, instead of an experienced employee hired from within, as dictated in the Defendants' company policies and procedures.  Plaintiff had been informed that he had been passed over for promotion specifically because of his Sunday unavailability due to his religious Sabbath observance and Pastoral commitments.  For many years, Plaintiff was not sent information of available positions within the company although it was standard company policy for the company to send this information to qualified employees such as Plaintiff.

14.     Plaintiff alleges that Defendants behaved in bad faith, spoliated relevant evidence, and engaged in a pattern of discrimination against Plaintiff when Plaintiff suffered a Workers' Compensation injury in February of 2013.  Plaintiff, who is Hispanic, alleges that Defendants racially discriminated against him and treated him differently than they customarily treat injured Caucasian individuals in dealing with his Workers' Compensation claim.  Defendants refused to honor Plaintiff's previously accepted light duty work restrictions, put Plaintiff on a forced unpaid FMLA leave, spoliated evidence which was required to be preserved by Defendants, harassed and disparaged Plaintiff, wrongfully contested and then denied Plaintiff's valid Workers' Compensation claim, and subjected him to retaliation for pursuing his Workers' Compensation claim.

15.     Plaintiff timely pursued charges of discrimination through the EEOC against Defendants based upon state and federal civil rights and antidiscrimination laws.  Plaintiff specifically named, under the theory of respondeat superior, John Scott Stiverson (hereafter

"Scott Stiverson"), Greg Roberts, Kirsten Willis, Pam Perry, Ruben Maldonado, Elizabeth Thomas, Nate Salazar, Keri Teuber, Don Martin, Steven Speights, Tracy Carter, Scott Conklin, Rachael Tsirlin and Kim Hickson (also known as Kim Hickson-Erickson) as employees and agents of Defendants involved in the discriminatory practices to which he was subjected.   Plaintiff additionally named Dawn Gaschler and Keith Denhoff as individuals who, in their positions with Defendants, should have investigated and protected Plaintiff after Plaintiff brought his concerns to their attention through Defendants' Open Door and Global Ethics complaint system.   Although Plaintiff, from 2011 through 2015, brought twelve separate and distinct Open Door and Global Ethics concerns to their attention, they did little to correct the situations.   Plaintiff is now pursuing his claims against Defendants and is exercising his right to add his statutory discrimination claims to this civil action.   In addition to his EEOC claims, Plaintiff has claims against Defendants based upon defamation, spoliation, bad faith, intentional infliction of mental distress, and deprivation of his rights to substantive and procedural due process in his employment with Defendants. Plaintiff preserves his right to amend this Complaint to add additional statutory discrimination claims.

16.     Plaintiff has satisfied all administrative and jurisdictional prerequisites to the filing of this action, including receipt of a Notice of Right to Sue less than 90 days prior to the bringing of this action.

## FACTUAL ALLEGATIONS

17.     Plaintiff, who is in his forties, is an active, full-time employee of Store # 6632 of Sam's Club, Inc. a/k/a Sam's West, Inc. (hereinafter "Sam's Club") working for them in the City and County of Denver, Colorado, commencing on or about December 20, 1999.

18.     During the interview process (in 1999), when Plaintiff was hired by Hiring Manager Janet Grey and Regional Sales Manager BJ Brock, Plaintiff advised them that he is Pastor with Pastoral duties to his Church and would not be available to work for Defendants on Sundays.   Ms. Grey and Mr. Brock informed Plaintiff that Sunday availability would not be an employment issue and it would not prevent Plaintiff from advancing within Sam's Club up to and including securing management positions.

19.     Plaintiff started his employment as an Outside Marketing Representative for Sam's Club.  By 2004, he was a Sam's Club Membership Team Lead.

20.     Plaintiff is a valuable and knowledgeable employee in his capacity as a Membership Team Lead.  Prior to the tenure of former Club Manager, Scott Stiverson, (September 14, 2012 to September 4, 2015) Plaintiff was a three-time "Associate of the Year" and multiple time "Associate of the Month".   He also had been named "Market 56 Best Practice Associate" which is a regional recognition of excellent work.

21.     Plaintiff was educated, trained, experienced and qualified to work in his position and in other positions, including management positions, at Sam's Club.   Plaintiff attended training programs offered by Sam's Club, reviewed Defendants' Computer Based Learning

Module (CBL's) of company policies and procedures, and spent his own time learning additional details of the company's policies and procedures so he would be educated and informed on the details of his job and the company's expectations.

22.     Defendants' Computer Based Learning Module (CBL's) of company policies and procedures  include policy that:

a) an experienced associate should always be promoted over an inexperienced one and yet Plaintiff who has the experience, capability and have been recommended for promotion into a membership management role has been regularly passed over.

b) an applicant should always be interviewed for a position regardless of known availability limitations due to religious observance.  A situation regarding a Jewish applicant was referenced in the CBL Modules, and it stated that the manager must interview the applicant even when the manager knows of a scheduling limitation based on religious observance of the applicant's Sabbath.  Plaintiff rarely has been interviewed for the positions where he has applied, both in the store where he works and in others, because of his lack of Sunday availability.

c) employees should "not alienate or change the treatment of any associate who has raised concerns, because this can be construed as retaliation," and "if we see retaliation, we should bring it to the attention of a manager or to Global Ethics." The Module states that "Wal-Mart and Sam's Club WILL NOT tolerate discrimination in employment, employment-related decisions, business dealings with regard to race, color, ancestry, sex, sexual orientation, religion or disability"

d) A "Discrimination and Harassment Not Tolerated over Religious Practices and Beliefs."  CBL uses the scenario, "A Sam's Manager has a special needs daughter who suffers from a rare condition which causes the manager to have to run home without notice".   The CBL states, "We need to retain talented associates in an increasingly diverse work force.  This means having respect for the individual and having interactive discussions with associates who need us to accommodate disabilities, religious practices, beliefs . . . . Title VII says we must make an effort to accommodate religious practices and beliefs  .  .  . We cannot retaliate against associates who are involved in an investigation."

Despite the company policies and procedures as noted in the CBL's, which are required to be reviewed by all employees and management, Plaintiff has experienced continued breaches of Defendants' implied employment contract over and over again in Plaintiff's almost seventeen years of employment with Defendants.

23.     Plaintiff has the skills and qualifications to be Membership Assistant Manager (MAM) as well as Market Membership Sales Manager (MMSM), Market Membership Assistant Manager (MMAM), Member Service Assistant Manager (MSAM), Asset Protection Manager (APM) and Asset Protection Assistant Manager (APAM).   He has requested a promotion to those positions several times since 2009, but was denied promotions on the basis of his Sunday unavailability.  Plaintiff has been denied all positions for which he has applied since 2009.  Plaintiff has also been denied transfers to other of Defendants' corporate stores.  Additionally, Plaintiff has been told on repeated occasions that there are no openings for positions within the company when there actually were openings.

24.     From 2005 to 2010, Plaintiff was former Market Membership Sales Manager (MMSM) Tim Laffitte's assistant, and Plaintiff would teach and train, reset offices, etc. as part of his duties.  When Tim Laffitte prepared to leave the position, he informed Plaintiff that he has spoken to then Divisional Membership Sales Manager Cyndi Albaugh (now a Regional Mountain Sales Manager) and suggested Plaintiff be promoted into the MMSM position. Walmart Headhunter Logan Manachaim also felt Plaintiff would be appropriate for the position and actively recruited him.  Plaintiff applied to promote into the vacant MMSM position, but was passed over and Adam Dykhuizen, who is Caucasian and has Sunday availability, was given the position.  Mr. Dykhuizen who had failed in a previous stint as a MMSM was put into the position.  The four MMSM's that interviewed Plaintiff but passed him over in favor of Mr. Dykhuizen told Plaintiff that he interviewed well but that his lack of Sunday Availability was an issue with them.

25.     Since 2009, Plaintiff has been passed over for all the promotions or transfers that he has requested.  Frequently, Plaintiff was told it was due to his Sunday unavailability. However, the majority of the people who received the management positions Plaintiff was seeking, were Caucasians, were from outside the company, were younger than Plaintiff, and/or had little or no experience for the position.  Plaintiff has trained and continues to be tasked with training numerous individuals in the Manager-in-Training program for Market Management positions and Club Management positions. Many of the individuals trained by Plaintiff have gone on to become Club Managers or to have Market Management positions. Plaintiff was told at time of hire that his Sunday unavailability would not be a hindrance to his advancing in the company, yet his Sunday unavailability or his racial background appear to have prevented him from promoting.  Although Defendants' policies and procedures dictate that qualified applicants are to be granted interviews and that accommodations are supposed to be made for religious observance, Plaintiff has been denied all Manager-in-Training positions for which he has applied for the specific and stated reason that he did not have Sunday availability.  Plaintiff has worked part of the day on certain Sundays when Defendants were in difficult situations and did not have another person to cover what they needed and he has told Defendants that he would have made arrangements with his Church to be available to participate on the mandatory couple of Sundays during the MIT training program.  He explained to Defendants, during his tenure with them, that if Defendants had a very important event or participation where they adamantly wanted Plaintiff to attend, that if he was given advance notice and if the particular Sunday was not a religious holiday, that he would attempt to make arrangements to be available for Defendants.   Despite his qualifications and his reporting of the adverse discriminatory actions of Defendants and their agents through the proper procedures on multiple occasions within the last seven or so years, Plaintiff has not been able to advance within the company.

26.     Plaintiff has been told by numerous individuals including the four MMSM's who interviewed him for the MMSM position at the end of 2010, by Market Human Resource Manager (MHRM) Kirsten Willis, and by other management personnel that he interviews well.  Plaintiff has been recommended for jobs by his supervisors and recruiters, and told by other managers that there was no legitimate reason he should not be promoted.  The list of people put into positions for which Plaintiff applied include:

a) Adam Dykhuizen, who is Caucasian and has Sunday availability, was given the position of MMSM in 2010 despite his previous failure as a MMSM;

b) Scott Conklin, who is Caucasian and had Sunday availability and who had no experience in membership, was given the position of MAM in 2011;

c) Kay Stahm, who is Caucasian, was hired for the position of Market Assistant in January of 2013. Originally, on November 28, 2012, Plaintiff applied for the open Market Assistant position and MHRM Kirsten Willis said the requisition was closed and would be re-opened at a later time. On January 15, 2013, when the requisition was apparently re-opened, Plaintiff was not notified or re-interviewed, and Ms. Stahm was hired.

d) Keri Teuber, who is Caucasian, was promoted to MSAM although she has no membership knowledge. She was subsequently terminated for mishandling a situation. Plaintiff requested again to be considered for the position when Ms. Teuber was terminated. Plaintiff was not contacted or interviewed for the position.

27.     If Plaintiff had been promoted to MMSM, MMAM, MAM, MSAM, APM, or even APAM, he would have had a substantially increased salary, substantially more 401 matched contributions, his annual income from these positions would have put him in a better retirement position with the Social Security Administration and he would have had the résumé value of these positions on his résumé, as well as having the ability to further promote within the company.

28.     In 2011, when Plaintiff was passed over for a vacant Membership Manager position in favor of Scott Conklin, who is Caucasian and had Sunday availability, and who had no experience in membership. Plaintiff was told by MMSM Greg Roberts that he (Plaintiff) had "none-zilch-nada chance of promoting", despite having run the department for six months prior to Scott Conklin's hiring, and that Plaintiff should not waste his time in applying for management positions. Sam's Club's Computer Based Learning Module of company policies and procedures states that an experienced Associate should always be promoted over an inexperienced one and yet Plaintiff who has the experience to move into a membership management role has been regularly passed over. This occurred by multiple agents of Defendants and was observed by multiple individuals.

a) On October 12, 2012, Plaintiff was harassed by MAM Ruben Maldonado for not working on Sundays. Plaintiff complained to MMSM Greg Roberts. Following Plaintiff reporting his concerns, Mr. Roberts started retaliating against Plaintiff and appeared to be regularly trying to find a way to terminate Plaintiff. After this Ruben Maldonado and Club Manager Scott Stiverson, repeatedly harassed Plaintiff to open his Sunday availability. On numerous occasions, they ordered Plaintiff to act inappropriately, in an unethical manner, or in direct conflict with company policies and procedures. At one point, around November 2012, Ruben Maldonado tried to get Plaintiff to hand key credit card numbers (which was against policy at the time). When Plaintiff refused, citing it was against the company policies and procedures, Ruben Maldonado made statements of "You're too smart, Joe;" then "We'll have to find another way to get to you"; and "If Management wants to get you, there are a 1,000 ways to get you." Plaintiff reported these comments to then MHRM Kirsten Willis. Around this same time period, Ruben Maldonado instructed Sonia Tec, an

Hispanic woman, to hand key credit card numbers, and although Plaintiff warned her it was against policy, she was afraid to go against Mr. Maldonado's instructions. Sonia Tec was then terminated by Scott Stiverson for following the inappropriate instructions of MAM Ruben Maldonado.

b) On April 22, 2014, former Club manager for Club #6632, George Charity, informed Plaintiff that Greg Roberts made the determination that Plaintiff would not promote and that he (Mr. Roberts) was actively involved in disparaging Plaintiff and wanted to get rid of Plaintiff.

c) A former Club manager of the Littleton, Colorado Club named Brian, Club #6635, on October 14, 2013, informed Plaintiff that Plaintiff was not being promoted because of his ethic background telling him that Plaintiff wasn't promoted "because [Plaintiff] don't fit the 'profile'".    On that same day, October 14, 2013, a former Market Assistant named Ms. Phuong, acknowledged to Plaintiff that Plaintiff's managers were out to get him, and his inability to promote was due to his Sunday unavailability.

d) On February 26, 2014, Tom Compton, a former Assistant Manager, told Plaintiff that Plaintiff should have been promoted to MAM before Ruben Maldonado or others.

e) On April 22, 2014, former Club manager for Club #6632, George Charity, informed Plaintiff that Plaintiff should have been promoted to management but was not promoted due to racial discrimination and Sunday unavailability.

29.   Plaintiff has been mocked for his religious belief and observance.

a) On October 12, 2013, MSAM Keri Teuber, who is Caucasian, made anti-religious comments to Plaintiff and assaulted Plaintiff by ripping paper from his hands.   This was witnessed by an associate named Jared and an assistant manager named Jose. This was brought to the attention of Co-Manager Rachael Tsirlin, who is Caucasian, and no action was ever taken.

b) On December, 23, 2013, Plaintiff walked into the Breakroom where Kim Hickson, Scott Stiverson and an associate were mocking and laughing about Plaintiff's Sunday availability and 9-5 shifts, saying "Where's my Sundays" and "Where's my 9-5 [Shift]?"   When they realized Plaintiff was there, they stopped and changed the conversation subject.

30.   Defendants treated Hispanic individuals differently than they treated Caucasian individuals.

a) In Worker Compensation situations, Hispanic employees were put on unpaid FMLA leave, but Caucasian employees were provided light duty positions within the Club.

b) Caucasian employees could easily obtain transfers to other Clubs while Hispanic employees were customarily denied these transfers.

c) On November 13, 2013, Defendants' agents during a conference call set up a Mexican themed membership sales event, where there would be two teams the "Blue Burritos" and the "Green Tamales", who would compete.   If participants didn't make their quota, they were to wear the "Sombrero of Shame" in the Club.

d) Plaintiff's former Fax & Pull Associate John "Chris" Clayton, who is Caucasian, received a requested transfer to a Wal-Mart close to his home.   Chris Clayton informed Plaintiff that his transfer request was expedited by MHRM Dawn Gaschler.

Yet requested transfers for Melanie Cordova, Jessica Gallardo and for Plaintiff, all Hispanic individuals at the same Club where Chis Clayton had previously worked, were regularly blocked from their requested transfers.

e) After Plaintiff returned from a forced FMLA in 2013 (after suffering a WC injury) he was told repeatedly that race was a factor in how Defendants treated employees and whether they promoted. An example is the former Club manager of the Littleton, Colorado Club telling Plaintiff that Plaintiff wasn't being promoted because he did not fit the "profile" for management.

f) Vacation requests and bereavement leave requests were approved for Caucasian employees before being approved for Hispanic employees and much of the time the vacation request or bereavement request for the Hispanic employee was denied. Additionally, Caucasian employees were scheduled to have more holiday days off at holidays such as Thanksgiving than Hispanic employees received.

31. On or about February 20, 2013, Plaintiff suffered a workers' compensation injury on Sam's Club property in view of Defendants' security cameras. Plaintiff continued to work until March 8, 2013 when he was taken off work for a week. Concentra (the Workers' Compensation medical provider) provided Defendants with Plaintiff's medical restrictions that were approved by Club Manager Scott Stiverson, yet on March 15, 2013, the day Plaintiff was scheduled to return to work, Defendants refused to allow Plaintiff to work until his physician declared he was at 100%, and he was escorted off the property by management personnel. It was the stated practice and policy that Defendants would reasonably accommodate employees' injuries, illnesses, infirmities, and vulnerabilities of employees so that work was assigned and adjusted to enable, assist, and facilitate continued employment of employees on a consistent, practical, good faith, and fair basis as discussed in Defendant's Computer Based Learning. However, Hispanic employees were put on unpaid FMLA leave where Caucasian employees were provided light duty positions within the Club, and were thereby accommodated with some income and all benefits intact.

32. The Defendants and their agents attempted to sabotage Plaintiff and prevent him, his wife and their six school-aged children from receiving any Temporary Aid to Needy Families (TANF) benefits and prevent Plaintiff from receiving temporary Medicaid, by telling Jefferson County Social Services that Plaintiff was still "job attached", although Defendants had placed him on an unpaid leave of absence and had canceled his medical coverage. Plaintiff needed Medicaid because Defendants, when they denied Plaintiff's Workers' Compensation injury and put him on forced FMLA, told Plaintiff he could no longer be seen at Concentra and then subsequently, despite Plaintiff paying his medical insurance premiums, cancelled his employee medical coverage. Additionally, upon information and belief, based upon statements by Defendants and their agents to the short-term disability insurance provider, Plaintiff was denied short-term disability benefit coverage.

33. There were repeated instances of spoliation of evidence and bad faith by Defendants relating to Plaintiff's Workers' compensation injury. The Division of Workers' Compensation, after hearing in front of an Administrative Law Judge, determined that Plaintiff's Workers' compensation injury was indeed compensable. The matter was finally resolved in 2015, more than two years after the injury had occurred and more than two years

after Defendants wrongfully denied Plaintiff workers' compensation benefits and forced him onto unpaid FMLA.

34.     While dealing with the forced FMLA, Plaintiff's employment was repeatedly threatened by Personnel Training Coordinator Tami Knisely and Club Manager Scott Stiverson, who sent Certified Mail letters to Plaintiff stating that if Plaintiff did not respond within very short periods of time days, that his employment would be terminated.  This occurred in In April of 2013, May of 2013, and in June of 2013,  Also during this time, Defendants' agents had been soliciting employees, as early as late April to early May 2013, (within the 12 week FMLA period where Plaintiff's job was supposed to be held for Plaintiff) to fill Plaintiff's position as Membership Team Lead.

35.     On or about August 20, 2013, Plaintiff received full clearance to return work. Defendants demanded that Plaintiff reapply for his own position.  Plaintiff was interviewed three times, with specific questions about his Sunday availability being posed at each interview.  He was denied the opportunity to return to work in any capacity for three weeks, falsely informed he could not return in any capacity, and that Defendants were unable secondary job code him, which is routinely done for other employees.  This delayed Plaintiff's return to work until September 9, 2013.  Plaintiff was out of work, without salary, without his employee benefits, and without employee medical benefits for five months and three weeks.

36.     Plaintiff faced retaliation for his Workmen's Compensation claims, was retaliated against on his Annual Evaluations, was regularly threatened with termination and denied benefits and sabotaged during his forced unpaid FMLA leave, was denied vacation time requested three months in advance, and was denied appropriate bereavement leave.

37.     On November 11, 2013, Plaintiff was called into Scott Stiverson's office where Scott Stiverson verbally attacked Plaintiff by accusing him of several falsehoods, and then he and MHRM Kirsten Willis commenced to interrogate Plaintiff, without his attorney being present, specifically about his attorney's strategies regarding his Workers' Compensation claim and his EEOC claims.

38.     In March of 2013, before Plaintiff left on forced unpaid FMLA, the Club (Store #6632) was ranked near the top of the company in key membership metrics and sales income, but upon his return in September of 2013, the Club was ranked very near the bottom.  By September of 2014, Plaintiff had increased the Club's Outside Sales by 70% and the increased the Club's ranking to the top 20 to 25% of the company in key membership metrics and sales income.  Nevertheless, Club Manager Scott Stiverson randomly doubled and quadrupled Plaintiff's quotas and repeatedly berated Plaintiff for allegedly not meeting the Club's goals when Plaintiff had in fact met and exceeded the Club's goals.   In October of 2013, Scott Stiverson suggested Plaintiff apply for the position of Truckload Manager.  This seemed strange, as Plaintiff had no experience in this area, so he looked into it and found out that the position was to be eliminated.  Had he moved to that position, Plaintiff would have been subject to a layoff.   On or about December 18, 2013, Club #6632 was ranked number 1 in in the company in one of the membership metrics.  Club Manager Scott Stiverson never

acknowledged this to Plaintiff.  The following week, when Scott Stiverson gave Plaintiff his 2013 Annual Performance Evaluation, Mr. Stiverson attacked Plaintiff's performance, gave feedback allegedly from a MAM who had left the company the month prior, and made veiled threats to Plaintiff.  Plaintiff wrote a response on the evaluation and contacted Open Door and Global Ethics.  Plaintiff's issues were not addressed.

39.   Plaintiff was regularly subjected to harassment by Defendants.
   a)  On November 11, 2013, Plaintiff was called into Scott Stiverson's office where Scott Stiverson verbally attacked Plaintiff by accusing him of several falsehoods, and then he and MHRM Kirsten Willis commenced to interrogate Plaintiff, without his attorney being present, specifically about his attorney's strategies regarding his Workmen's Compensation claim and his EEOC claims. It is a violation of Defendants' CBL policies and procedures to harass an employee about any legal claims that have arisen regarding the workplace.
   b)  Plaintiff was on lifting restrictions because of disability and MSAM Pam Perry made it a practice of leaving heavy boxes on Plaintiff's desk or requested Plaintiff lift something overhead, or for Plaintiff to clean a storeroom or organize items in the storeroom in attempts to make Plaintiff violate a lifting restriction.  Plaintiff had to request others to move the boxes from his desk for him so he could sit at his desk and do his work.
   c)  On June 6, 2014, during the Team Leader Meeting, APM Kim Hickson made the statement that there were no qualified applicants for an Asset Protection opening and stated that the current applicants "could not string a sentence together."  This was embarrassing and humiliating to Plaintiff, since he writes well and is a qualified applicant, and also because everyone there knew he had applied for the position, yet was disqualified due to his "Sunday unavailability".  Plaintiff had not even been informed when the position re-opened.

40.   Since Plaintiff brought a charge with the EEOC, he has been disparaged, defamed, and retaliated against by Defendants, both in the Club where he works and other Clubs and outside his workplace.  Plaintiff was informed that people in Clubs in Thornton and Littleton had heard disparaging comments about his veracity. Plaintiff noticed, that when he applied for lateral transfers to these Clubs that he wasn't even given the courtesy of a telephone call or interview.  For example, in August of 2014, Plaintiff was interested in a position at Club #4745 in Thornton and applied for the position. The Club Manager is someone that Plaintiff trained and who promoted to Club Manager.   The person offered the positon had less experience than Plaintiff and chose to reject the offer.  Plaintiff was interested in the position and was never contacted or interviewed.

41.   Defendants has policies for filing complaints within the company, which are known as Open Door and Global Ethics.  Plaintiff has filed these and followed up on them with very little results, if any.  Plaintiff's complaints did nothing to change Defendants' behavior.

42.   Plaintiff filed twelve separate concerns with both Open Door and Global Ethics between 2011 and 2015.  Plaintiff commenced these Open Door complaints and Global Ethics concerns in July 2011, October 2012, November 2013, March 2014, April 2014,

October 2014, November 2014, January 2015, May/June 2015 and December 2015. Plaintiff emailed and telephoned about each area of concern and attempted to speak to Corporate Management in person about possible resolution. The vast majority of Plaintiff's concerns were not addressed by Defendants or even acknowledged. If they were acknowledged, it took months and months of Plaintiff arguing the issue before Defendants would deal with the concern.

43.     On September 29, 2014, Defendants and their agent, Scott Stiverson, denied Plaintiff Bereavement time and/or pay for the death of his aunt, saying it is not available for aunts. Plaintiff informed him that it was given to two(Caucasian employees for their uncles. On October 8, 2014, MHRM Dawn Gaschler told Plaintiff that the Bereavement Policy had changed when it had not. On October 17, 2014, Plaintiff found the Bereavement Policy on the WIRE (from 2010 and 2014) and it states plainly that it is up to the Club Manager, which was Scott Stiverson, in his discretion whether or not to award bereavement to Plaintiff. Plaintiff sent an email to Scott Stiverson and Dawn Gaschler demanding to be treated fairly and equally and in the same manner as the two Caucasian females, Debbie Fugate and Theresa Lewis, who received bereavement when their uncles died. After arguing this issue and bringing it up to Defendants' Global Ethics and Open Door departments, as well as after filing a new EEOC charge that specifically raised this concern, Plaintiff was informed, on or about March 9, 2015, that he would receive the bereavement pay he had been requesting for close to six months.

44.     On January 22, 2015, after numerous Open Door complaints and Global Ethics concerns had been filed by Plaintiff, MMSM Keith Denhoff from Upstate New York spoke with Plaintiff regarding Plaintiff's frustrations with Defendants, the discrimination, lack of promotions and transfers, violations of company policies, and the retaliatory annual evaluations from Pam Perry and Scott Stiverson to which he had been subjected. As of this date, nothing has occurred as a result of the conversation with Mr. Denhoff.

45.     Plaintiff has developed on-going stress related medical issues, not related to his Workers' Compensation injuries, that are a result of the discrimination, defamation, retaliation, general workplace hostility to which his has been subjected. He currently suffers from permanent physical limitations and disability. He has been and continues to be discriminated against in violation of the ADA, the Civil Rights Acts and their Amendments, and Defendants' policies and procedures. The discrimination, retaliation, and defamation of his reputation continues to this day and has permanently damaged his standing throughout the corporate structure, limited his ability to advance within the company and outside of it, thereby having limited his current and future income and benefits and caused mental distress.

46.     Plaintiff has exhausted all administrative remedies available to him to the extent required by applicable Federal statutes.

## CLAIMS FOR RELIEF
### Count I. Discrimination Based upon Religion

47.     Plaintiff adopts and incorporates the allegations set forth in paragraphs 1 through 46

of this Complaint as if fully set forth below.

48.     Plaintiff is a Pastor and a devout Christian.  During his initial employment interviews, Plaintiff informed Defendants that he was not available to work on Sundays. He informed Defendants that he observes a Sunday Sabbath as well as having Pastoral obligations to his congregation to conduct Sunday Sabbath services.   Defendants assured Plaintiff that Plaintiff's lack of Sunday availability would not be an employment issue and it would not prevent Plaintiff from advancing within the company up to and including securing management positions.   Plaintiff has worked for Defendants for almost seventeen years.   He has an excellent record of awards and accomplishments as well as a record of regularly meeting and exceeding goals set out by Defendants.

49.     The Defendants intended to discriminate against Plaintiff on the basis of religion when they refused to accommodate Plaintiff's religious obligations.  Defendants, since at least 2009, Defendants have continuously overlooked Plaintiff's applications for advancement in the company at both the location where he works, and at other locations where he could transfer.  Defendants made false, derogatory and defamatory derogatory statements about Plaintiff to other employees, and especially managers at his store location and others stores within the company who were hiring about Plaintiff's "refusal to work on Sundays" which was not true as Plaintiff did accommodate Defendants by working part of the day on certain Sundays when Defendants were in difficult situations and did not have another person to cover what they needed. Defendants have promoted less experienced employees, or newly hired employees from outside the company, into the positions for which Plaintiff had applied and has then tasked Plaintiff with training the new person for the position they denied to Plaintiff.  Defendants lied to Plaintiff and tried to manipulate him by saying he was required by Defendants to work on Sunday. They mocked, harassed and threatened Plaintiff's employment when he told them that Defendants knew at time of hiring of his Sunday unavailability.

50.     As a direct and proximate result of Defendants' discriminatory actions Plaintiff has suffered significant injury and damages including but not limited to, material employment disadvantages to Plaintiff including the loss of income and benefits, lack of bonuses and raises, and the inability to advance with the company, which has affected Plaintiff's future career prospects and future financial standing for income, bonuses, raises and benefits and retirement benefits.

51.     By failing to accommodate Plaintiff's religious obligations and availability, Defendants and their agents have deprived Plaintiff of equal employment opportunities, created a hostile work place, caused extreme mental distress, affected the terms and conditions of Plaintiff's employment, and otherwise adversely affect his status as an employee.

52.     The unlawful practices complained of in the above paragraphs were intentional.

53.     The unlawful practices complained of in the above paragraphs were done with malice or reckless disregard and indifference to the Plaintiff's federally protected rights thereby

entitling Plaintiff to pursue punitive damages against Defendants.

54.     The effect of Defendants' practices deprived Plaintiff of equal employment opportunities in violation of his rights under state and federal law.

55.     Plaintiff is entitled to recover from Defendants for his economic and non-economic losses, including damages based upon willful violation of the law by Defendants.

## Count II. Discrimination Based on Race

56.     Plaintiff adopts and incorporates the allegations set forth in paragraphs 1 through 55 of this Complaint as if fully set forth below.

57.     Plaintiff is of Hispanic descent.  He has worked for Defendants for almost seventeen years and has an excellent record of awards and accomplishments, as well as meeting and exceeding the goals set out by Defendants.

58.     Defendants have discriminated against Plaintiff by subjecting him different treatment based upon his race pervasive enough or severe enough to alter the terms and conditions of Plaintiff's employment.

59.     The Defendants intended to discriminate on the basis of race as jobs Plaintiff applied for were filled by less experienced and/or newly hired Caucasians.  Defendants and their agents would not let Plaintiff and other Hispanic individuals transfer to other Clubs or Wal-Mart  when Caucasian were given expedited transfers, Plaintiff and other Hispanic individuals were given fewer days off of work at holidays such as Thanksgiving and Christmas as compared to Caucasian employees and Caucasian management.  Plaintiff and other Hispanic individuals were denied bereavement leave for close relatives when Caucasian individuals were allowed bereavement leave in similar situations.  Plaintiff and other Hispanic individuals were denied the ability to work on light duty when light duty had been authorized by the Workers' Compensation physicians, causing them to be put on forced unpaid FMLA without medical benefits while Caucasian individuals were accommodated and allowed to work on light duty with pay with  all of their benefits continuing until they were 100%.

60.     These discriminatory actions created material employment disadvantages to Plaintiff including, but not limited to the loss of income and benefits, lack of bonuses and raises, inability to advance which has affected Plaintiff's future career prospects and future financial standing for income, bonuses, raises and benefits, and the refusal to let Plaintiff work on light duty when medically able created circumstances amounting to a constructive discharge.

61.     The effect of Defendants' practices complained of in the above paragraphs have been to deprive Plaintiff of equal employment opportunities, affected the terms and conditions of Plaintiff's employment, created a hostile work place, caused Plaintiff extreme mental distress, and otherwise adversely affect Plaintiff's status as an employee.

62.     The unlawful practices complained of in the above paragraphs were intentional.

63.     Defendants' unlawful practices, as complained of in the above paragraphs, were done with malice or reckless disregard and indifference to Plaintiff's federally protected rights thereby entitling Plaintiff to pursue punitive damages against Defendants.

64.     Plaintiff is entitled to recover from Defendants for his economic and non-economic losses, including damages based upon willful violation of the law by Defendants.

## Count III. Discrimination Based on Age

65.     Plaintiff adopts and incorporates the allegations set forth in paragraphs 1 through 64 of this Complaint as if fully set forth below.

66.     Plaintiff is over the age of forty.  He belongs to a protected age class, protected by both state and federal law.

67.     Defendants developed, used, and/or operated under a plan, practice, approach, scheme, or concept whereby it, in effect, sought to eliminate or force out older workers from employment with them.

68.     The Defendants intended to discriminate against Plaintiff on the basis of age by continuously overlooking Plaintiff's applications for advancement in the company, by promoting younger, less experienced employees or newly hired employees from outside the company into the positions for which Plaintiff had applied and then have Plaintiff train them for that same position.  Defendants made false, derogatory and defamatory statements about Plaintiff to other employees, and especially managers at his store location and others stores within the company who were hiring and harassed and threatened Plaintiff regarding his job continuation.

69.     Defendants have deprived Plaintiff of equal employment opportunities, created a hostile work place, caused extreme mental distress, affected the terms and conditions of Plaintiff's employment, and otherwise adversely affected his status as an employee.

70.     The unlawful practices complained of in the above paragraphs were intentional.

71.     Defendants' unlawful practices, as complained of in the above paragraphs, were done with malice or reckless disregard and indifference to Plaintiff's federally protected rights thereby entitling Plaintiff to pursue punitive damages against Defendants.

72.     Plaintiff is entitled to recover from Defendants for his economic and non-economic losses, including damages based upon willful violation of the law by Defendants.

## Count IV. Violation of the Americans with Disabilities Act

73.     Plaintiff adopts and incorporates the allegations set forth in paragraphs 1 through 72 of this Complaint as if fully set forth below.

74.     At all times relevant to this action Defendants were covered entities within the meaning of state and federal law, including the Americans with Disabilities Act. Under Section 101(2) of the ADA, which incorporates the powers, remedies, and procedures set forth in Title VII of the Civil Rights Act as amended, 42 U.S.C. § 2000E *et seq*., Defendants are covered entities. Both Defendants had and continue to have at least 15 employees. Defendants constituted the employer of Plaintiff within the meaning of applicable state and federal law, including 42 U.S.C. §2000E(b).  At all times material hereto, plaintiff was an employee of Defendant, Sam's Club and parent company Defendant Wal-Mart within the meaning of 42 U.S.C. 2000E(f).

75.     The Americans with Disabilities Act defines a disability as a physical or mental impairment that substantially limits one or more major life activities and covers individuals who had a disability, had a history of disability, or was perceived by the employer as having a disability.

76.     Plaintiff is, and was, a member of a protected class under the Americans with Disabilities Act of 1990, 42 U.S.C. 12111, *et seq.,* by virtue of his back and neck issues that originated with his WC injury and mental health issues resulting from, or exacerbated by, the conduct of Defendants.

77.     Plaintiff was qualified for his position as Membership Team Lead.  He was able to perform the duties of his position with or without accommodation.   After sustaining a Workers' Compensation injury in February of 2013, the Concentra doctors forwarded work restrictions to Defendants on March 14, 2013 that were approved on March 14, 2013 by Club Manager Scott Stiverson.   The restrictions were that Plaintiff use a high backed chair to provide support to his upper back and his neck and that he not lift items over a certain poundage.  Although Defendants when accepting individuals for employment, required that applicants be able to lift certain poundage, Plaintiff, in his job position as Membership Team Lead, rarely had any lifting as part of his job duties.  The minimal lifting that a Membership Team Lead would do would be to put together supplies and materials for a membership drive, carry materials in a briefcase or rolling case when meeting with local businesses that might  be interested in Sam's Club business, or bring supplies and materials to a membership drive.  Plaintiff could make accommodation for his lifting restrictions by asking a Membership team person to carry supplies and materials into membership drive locations, asking a Membership team person to assist him with setting up a membership drive, and if he were going alone for him to use smaller folding tables to take with him that would be lighter and easier for him to carry than a larger folding table and for him to use a rolling  carry case for supplies and materials so the items would not need to be lifted.  There were normally multiple people going to membership drives thus there were other people who could lift supplies and materials if the weight of those items was over Plaintiff's lifting restriction.

78.     Although Concentra had light duty restrictions for Plaintiff and Defendants did accept those restrictions Plaintiff was capable of and could have performed the duties requirements and essential function of his job with or without accommodation.

79.     On March 15, 2013, when Plaintiff appeared for work, Defendants should not have

put him on forced FMLA leave, wrongfully denied his Workers' Compensation claim, and refused to let him return to work until he had a medical release showing that he was at 100%.

80.     After Plaintiff obtained the medical release that he could return to work on August 20, 2013, he was allowed by Defendants to return to work on September 9, 2013. Defendants may have perceived Plaintiff to be disabled due to the Workers' Compensation injury he had suffered, may not have wanted Plaintiff at the workplace, or were attempting to set Plaintiff up to lay him off, harass him until he quit, or make false reports about him and then fire him for them.  Plaintiff's work environment with Defendants was thus subjectively abusive and hostile to Plaintiff after his return from forced FMLA.

81.     Defendants subjected Plaintiff to harassment, intimidation, and confrontation behavior.

82.     The Defendants intended to discriminate against Plaintiff on the basis of **disability** including as follows:
   a)  **Defendants** mocked and humiliated Plaintiff regarding his pain and injuries;
   b)  **Defendants** defamed Plaintiff by calling him "a liar", "a fraud", "litigious", "faking it", and "costing the company money";
   c)  **Defendants** denied Plaintiff the accommodation to work on light duty, even though it was authorized by the Workmen's Compensation physician and had been approved by Clun Manager Scott Stiverson;
   d)  **Defendants** put Plaintiff on forced unpaid FMLA, (without medical benefits,) for five and one half months, until he was at 100% physical capacity, when his job did not require 100% capacity;
   e)  **Defendants** sabotaged his applications for Medicaid and TANF by telling Social Services that Plaintiff was still "job attached";
   f)  **Defendants** threatened Plaintiff with termination while on FMLA if he did not fill out and return documentation within a short period of time;
   g)  **Defendants** were recruiting for his position within 12 weeks of being on unpaid FMLA leave;
   h)  **Defendants** and intentionally harassed Plaintiff by putting heavy boxes on his desk that they knew he could not move due to his weight restrictions: and
   i)  **Defendants** intentionally instructed Plaintiff on multiple occasions to do work that violated his weight restrictions due to his injuries.

83.     These discriminatory actions created material employment disadvantages to Plaintiff including, but not limited to the loss of income and benefits; lack of bonuses and raises; deliberately attempted to put Plaintiff in difficult and hazardous situations given his injuries; created a hostile work place; caused extreme mental distress; affected the terms and conditions of Plaintiff's employment, and otherwise adversely affected his status as an employee.

84.     Defendants knew directly of these offensive acts and the impact these acts were having on the mental and physical health of Plaintiff.  The Defendants failed to assist and/or attempt to rectify the discrimination, differential treatment and hostile employment

environment to which the Plaintiff was being subjected, causing him to suffer extreme distress, mental health issues and physical issues.

85.     The unlawful employment practices complained of above were intentional.

86.     The unlawful employment practices complained of above were done with malice or with reckless indifference to the federally protected rights of Plaintiff, thereby entitling Plaintiff to pursue punitive damages against Defendants.

87.     The effect of Defendants' practices deprived Plaintiff of equal employment opportunities in violation of his rights under state and federal law.

88.     As a direct and proximate result of Defendants' unlawful treatment of Plaintiff, Plaintiff has suffered significant injury and damages.

89.     Plaintiff is entitled to recover from Defendants for his economic and non-economic losses, including damages based upon willful violation of the law by Defendants.

## Count V. Retaliation

90.     Plaintiff adopts and incorporates the allegations set forth in paragraphs 1 through 89 of this Complaint as if fully set forth below.

91.     Plaintiff pursued a Workers' Compensation matter that Defendants' wrongfully denied.  On April 16, 2013, Plaintiff filed EEOC Charge No. 541-2013-01272 and on March 6, 2015 he filed EEOC Charge No. 541-2015-01774. Plaintiff participated in protected conduct that consisted of whistleblowing efforts regarding Defendants discriminatory actions toward another employee and his following the procedural process of trying to rectify the situation.   He also filed official complaints with Open Door and Global Ethics regarding the racial, religious, and disability discrimination he experienced on a regular basis.

92.     Despite the Plaintiff's complaints, protest, and opposition to Defendants about the conduct alleged herein, the harassment, intimidation, and confrontation behavior directed at Plaintiff continued and escalated in retaliation of Plaintiff's pursuing his Workers' Compensation case, his filing EEOC Charge No. 541-2013-01272 and EEOC Charge No. 541-2015-01774, and his whistleblowing to Open Door and Global Ethics.

93.     Defendants' unlawful conduct occurred from multiple levels of management as well as from co-workers.

94.     Defendants' failure to take action to stop retaliatory conduct was unlawful and constituted retaliation.

95.     Defendants have committed ongoing retaliatory actions that are discriminatory, defamatory, humiliating, and breached Defendants' policies and procedures by:
    a)  increasing Plaintiff's quota by double to quadruple the normal;

b) defaming Plaintiff by spreading rumors that Plaintiff has not produced as well as he should have when in fact he was meeting and exceeding goals;

c) threatening Plaintiff with termination when on forced FMLA in 2013 if he did not immediately respond to Defendants letters that had been mailed to him;

d) denying Plaintiff recognition of his accomplishments, when others were both rewarded and acknowledged; and

e) denying Plaintiff appropriate due process to handle his various claims and concerns within the company.

96.     The unlawful practices complained of in the above paragraphs were intentional.

97.     The unlawful practices, as complained of in the above paragraphs, were done with malice or reckless disregard and indifference to the Plaintiff's federally protected rights, entitling Plaintiff to pursue punitive damages against Defendants.

98.     The Defendants failed to assist and/or attempt to rectify the discrimination, differential treatment and hostile employment environment to which the Plaintiff was being subjected, causing him to suffer emotional distress, mental health issues and accompanying physical symptoms, and physical disability.

99.     The conduct and failure of Defendant to provide any relief or assistance to Plaintiff severely altered Plaintiff's employment circumstances and created a hostile employment environment, caused extreme mental distress, affected the terms and conditions of Plaintiff's employment, and otherwise adversely affected his status as an employee.

100.    As a direct and proximate result of Defendants' unlawful treatment of Plaintiff, Plaintiff has suffered significant injury and damages.

101.    Plaintiff is entitled to recover from Defendants for his economic and non-economic losses, including damages based upon willful violation of the law by Defendants.

## **Count VI. Spoliation**

102.    Plaintiff adopts and incorporates the allegations set forth in paragraphs 1 through 101 of this Complaint as if fully set forth below.

103.    Defendants and their agents had access to security camera footage of Plaintiff's Workers' Compensation injury on February 20, 2013, which occurred just outside the entrance to Sam's Club.  Plaintiff and his attorney immediately informed Defendants to preserve all footage of Plaintiff per their written policies and procedures, including their Document Preservation Directive Form, Evidence Collection Sheet, to maintain two copies of all video showing the Plaintiff at time of injury and right before and right after, from one hour before to one hour after, the event that occurred.  Defendants are to maintain two copies of these videos and transfer them to DVD.   Plaintiff specifically requested that all videos be retained from the time he was leaving his office after clocking out, walking through store to exit, and all videos in the parking lot that showed what happened.

104.    For several months Defendants did not provide the video surveillance footage to Plaintiff.  Plaintiff, after a pre-trial hearing with the Division of Workers' Compensation, finally received some video footage from two cameras on the exterior of the Sam's Club building which was in very very low resolution.  Of the seventeen cameras on the front of the Sam's Club, five of the over-head cameras and one dome camera at the loading dock area should have shown all or part of Plaintiff sustaining his Workers' Compensation injury. Three and possibly four of the overhead cameras would have had a clear angle to see the injury occurrence.  Of these seventeen cameras, Defendants provided the overhead camera footage from a camera that was a substantial distance from the injury location   and additionally had a broken heater thus there apparently was snow and condensation on the lens and much of the view was blocked.  The other camera footage provided was from a dome camera that was too low to see Plaintiff when the injury occurred. It did show Plaintiff before and after the injury.  The resolution of the video footage had been reduced and the film frame speed appeared to have been altered before the footage was provided to Plaintiff.  The time clock on the footage was incorrect by approximately 30 minutes.  Plaintiff sustained injury at some time between approximately 4:55 p.m. to 5:00 p.m. and when Plaintiff and his counsel finally were able to find Plaintiff on the footage provided, the time stamp on the video footage showed 4:28 p.m.   We know this time to be incorrect because when Plaintiff clocked out, the time was recorded was 4:47 p.m., he then spoke to his team and thanked them for their service, he then spoke to an assistant manager for several minutes, and then he exited the building.  The video footage time stamp shows 4:27 pm. as Plaintiff is walking towards his vehicle.

105.    It took over two months of Plaintiff, his family, friends, attorney, and others examining the videos before Plaintiff ultimately found himself on the footage.  Because the policy and procedure directive is for Defendants to maintain the footage for one hour before and one hour after an incident and because the footage was for exactly two hours with an approximate  time frame from 3:30 pm. to 5:30 p.m. Plaintiff, decided to cue the footage to one hour in.  He watched and watched and watched and then thought he saw what appeared to be a wobbling motion.  He watched the other footage for the same time period and then used video enhancement techniques and then determined what he was seeing was likely himself.

106.    Defendants claim that no other footage existed.  However, Asset Protection Manager Elizabeth Thomas watched Defendants' surveillance video footage and remarked to Plaintiff about the expression on his face after he sustained injury.  Elizabeth Thomas commented that what occurred was a pure accident and there was nothing that Plaintiff could have done to prevent the accident.  She further commented that after the injury, Plaintiff stood for four seconds or so after falling, looked dazed before he moved, then he went to his van, got in, and after a while drove away.  In the footage provided to Plaintiff, it was not possible to recognize the image that was Plaintiff as being male or female, or to notice any distinguishing features about him.  There was no possibility of seeing any facial feature on the footage provided to Plaintiff.

107.    It was Defendants' Workers' Compensation strategy to challenge that Plaintiff ever sustained any injury, to argue that no event occurred, and to characterize Plaintiff as a liar

and a fraud who had fabricated a story to obtain Workers' Compensation benefits.  Since Defendants were challenging whether the injury ever occurred, it was important for Plaintiff to receive the camera footage form the various cameras and to receive it without the resolution having been lowered or the frame speed adjusted.   Failing to provide  video surveillance  footage from several cameras that would have had a clear view of the injury event as well as reducing  the footage resolution on the surveillance footage provided, might have prevented Plaintiff and his Counsel from being able to prove that Plaintiff had sustained a Workers' Compensation injury.  This is improper and is spoliation.

108.    The spoliation complained of in the above paragraphs was intentional.

109.    The Defendants' actions, as complained of in the above paragraphs, were done with malice or reckless disregard and indifference Plaintiff and his rights under state and federal law.

110.    As a direct and proximate result of the spoliation of evidence by Defendants, Plaintiff suffered loss of income (for the time he was on unpaid FMLA leave), exacerbation of his Workers' Compensation physical injury (as he had several months of no treatment since Defendants had wrongfully denied Plaintiff's Workers' Compensation claim), mental anguish, emotional distress, and other personal suffering.

111.    Plaintiff is entitled to recover from Defendants for his economic and non-economic losses, including damages based upon Defendants' willful actions.

## Count VII. Breach of Defendants'  Corporation Policies and Procedures

112.    Plaintiff adopts and incorporates the allegations set forth in paragraphs 1 through 111 of this Complaint as if fully set forth below.

113.    When Plaintiff suffered a Workers' Compensation injury, Concentra (the Workers' Compensation medical provider) provided Defendants with Plaintiff's medical restrictions which were approved by Club Manager Scott Stiverson.  On March 15, 2013, the day Plaintiff was scheduled to return to work, Defendants wrongfully denied Plaintiff's Workers' Compensation claim, denied Plaintiff the accommodation to work on light duty, refused to allow Plaintiff to work until his physician declared he was at 100% physical capacity even though his job did not require 100% capacity, put Plaintiff on a forced unpaid FMLA leave, and had management personnel escort him off the property.   Although Plaintiff received medical clearance to return to work on August 20, 2013, he was not allowed to return to work until September 9, 2013.  It was the stated practice and policy that Defendants would reasonably accommodate employees' injuries, illnesses, infirmities, and vulnerabilities of employees so that work was assigned and adjusted to enable, assist, and facilitate continued employment of employees on a consistent, practical, good faith, and fair basis as discussed in Defendant's Computer Based Learning.   However, Hispanic employees were put on unpaid FMLA leave where Caucasian employees were provided light duty positions within the Club, and were thereby accommodated with some income and all benefits intact.

114.    Despite Plaintiff's continued outstanding performance levels, exceeding quotas and sales levels, experience in the position(s) for which he had applied, and having temporarily held some of the positions for which he had applied for the interim time until they were filled, Defendants, nevertheless, hired others who were less experienced and/or newly hired from outside the company, instead of an experienced employee hired from within, as dictated in the Defendants' company policies and procedures.   The Defendants' Computer Based Learning Module (CBL's) of company policies and procedures stated that an experienced associate should always be promoted over an inexperienced one and yet Plaintiff who has the experience, capability and have been recommended for promotion into a membership management role has been regularly passed over.

115.    Defendants, since 2009, had continuously overlooked Plaintiff's applications for advancement in the company at both the location where he works, and at other locations where he could transfer telling him he could not promote due to his lack of Sunday availability. Defendants lied to Plaintiff and tried to manipulate him by saying he was required by Defendants to work on Sunday.  They made false, derogatory and defamatory derogatory statements about Plaintiff to other employees, and especially managers at his store location and others stores within the company who were hiring about Plaintiff's "refusal to work on Sundays" which was not true as Plaintiff did accommodate Defendants by working part of the day on certain Sundays when Defendants were in difficult situations and did not have another person to cover what they needed.   Defendants promoted less experienced employees, or newly hired employees from outside the company, into the positions for which Plaintiff had applied and has then tasked Plaintiff with training the new person for the position they denied to Plaintiff.   They mocked, harassed and threatened Plaintiff's employment when Plaintiff  told Defendants that they had been informed of his Sunday unavailability at time of hiring and had been told his Sunday unavailability would not affect his ability to promote within the company.   The policy per Defendants' CBL's is that an applicant should always be interviewed for a position regardless of known availability limitations due to religious observance.   A situation regarding a Jewish applicant was referenced in the CBL Modules, and it stated that the manager must interview the applicant even when the manager knows of a scheduling limitation based on religious observance of the applicant's Sabbath.  Plaintiff rarely has been interviewed for the positions where he has applied, both in the store where he works and in others, because of his lack of Sunday availability.

116.    Defendants  treated  Hispanic  individuals  differently  than  they  treated  Caucasian individuals.  Vacation requests and bereavement leave requests were approved for Caucasian employees before being approved for Hispanic employees and much of the time the vacation request or bereavement request for the Hispanic employee was denied.    Additionally, Caucasian employees were scheduled to have more holiday days off at holidays such as Thanksgiving than Hispanic employees received.    In Worker Compensation situations, Hispanic employees were put on unpaid FMLA leave, but Caucasian employees were provided light duty positions within the Club.   Caucasian employees could easily obtain transfers to other Clubs while Hispanic employees were customarily denied these transfers. The Module states that "Wal-Mart and Sam's Club WILL NOT tolerate discrimination in employment, employment-related decisions, business dealings with regard to race, color,

ancestry, sex, sexual orientation, religion or disability"

117.    As discussed in 'Count V. Retaliation', Plaintiff brought complaints to Open Door and to Global Ethics twelve different times from 2011 through 2015.  He pursued his Workers' Compensation matter and filed EEOC Charge No. 541-2013-01272 in 2013 and EEOC Charge No. 541-2015-01774 in 2015.   Despite the Plaintiff's complaints, protest, and opposition to Defendants about their discriminatory, the harassment, intimidation, and confrontation behavior directed at Plaintiff continued and escalated in retaliation of Plaintiff's pursuing his Workers' Compensation case, his filing EEOC Charge No. 541-2013-01272 and EEOC Charge No. 541-2015-01774, and his whistleblowing to Open Door and Global Ethics.  Defendants' in their CBL modules state  that they "not alienate or change the treatment of any associate who has raised concerns, because this can be construed as retaliation," and "if we see retaliation, we should bring it to the attention of a manager or to Global Ethics."   In the CBL  "Discrimination and Harassment Not Tolerated over Religious Practices and Beliefs." it is stated "A Sam's Manager has a special needs daughter who suffers from a rare condition which causes the manager to have to run home without notice". The CBL states, "We need to retain talented associates in an increasingly diverse work force. This means having respect for the individual and having interactive discussions with associates who need us to accommodate disabilities, religious practices, beliefs . . . . Title VII says we must make an effort to accommodate religious practices and beliefs . . . We cannot retaliate against associates who are involved in an investigation."

118.    Despite the company policies and procedures as noted in the CBL's, which are required to be reviewed by all employees and management, Plaintiff experienced continued breaches of Defendants' implied employment contract over and over again in Plaintiff's almost seventeen years of employment with Defendants.

119.    The effect of Defendants' practices complained of in the above paragraphs have been to deprive Plaintiff of equal employment opportunities, affected the terms and conditions of Plaintiff's employment, created a hostile work place, caused Plaintiff extreme mental distress, and otherwise adversely affect Plaintiff's status as an employee.

120.    The actions complained of in the above paragraphs were intentional.

121.    The Defendants' actions, as complained of in the above paragraphs, were done with malice or reckless disregard and indifference to Plaintiff and his rights under state and federal law.

122.    As a direct and proximate result of Defendants' unlawful treatment of Plaintiff, Plaintiff has suffered significant injury and damages.

123.    Plaintiff is entitled to recover from Defendants for his economic and non-economic losses, including damages based upon willful violation of the law by Defendants.

**<u>Count VIII. Bad Faith</u>**

124.    Plaintiff adopts and incorporates the allegations set forth in paragraphs 1 through 123 of this Complaint as if fully set forth below.

125.    Defendants communicated to employees their established corporate core values and commitments. They assured their employees, including Plaintiff, that they would be trustworthy in their dealings with employees; that they would treat people in good faith and fairly; that they did and would recognize that employees are their most important and valuable asset; that they would communicate openly and honestly; and that they would behave ethically and with integrity.

126.    Plaintiff expected he would be treated with respect by Defendants, that they would honor his dignity and rights, and that he would be free from harassment, coercion, confrontation, and discrimination.

127.    When Plaintiff, in his fourteenth year of employment with Defendants suffered a Workers' Compensation injury, Defendants engaged harassed, intimidated, and discriminated against Defendant as follows:

    a)        Defendants' agent, Dana Ardrey who was the assigned Workers' Compensation claims adjuster for Defendants after being informed Plaintiff was represented by Counsel interrogated him by telephone without Plaintiff having benefit of his Counsel present.  Defendants failed to produce audio recordings of Dana Ardrey's telephone call interrogations of Plaintiff. Although listed as a witness for hearing, after the ALJ ordered that final witness testimony would be taken by deposition, at time of deposition Defendants' Counsel informed Plaintiff and Plaintiff's Counsel that Dana Ardrey was not being made available to provide Deposition testimony;

    b)        Defendants failed to provide contact information for a witness (Defendants' former APM Elizabeth Thomas) who had left Defendants' employ and had moved out of state. Upon information and belief, Defendants were directing the witness to avoid subpoena service of process and directing the witness not to speak to Plaintiff's investigator;

    c)        Plaintiff and Plaintiff's Counsel requested video surveillance footage of Plaintiff's Workers' Compensation injury that was evidence Defendants by their own directives is required to maintain, yet Defendants did not supply any video material to Plaintiff and his Counsel until a Worker's Compensation pre-hearing ALJ, several months after the injury, ordered that Defendants' Counsel immediately provide the material to Plaintiff.   When the video footage was finally provided, as discussed in Count VI. Spoliation, only two camera views were provided where one which was from a camera with broken heater, there was evidence of condensation, ice or snow covering much if the lens area of view.   Footage of several cameras that would have had a direct  view of the injury occurrence  were not provided, and the footage provided had been altered in that the resolution had been significantly  reduced such that it was difficult to discern almost anything on the footage;

    d)        There were date / time stamp issues and issues of Defendants' APM Elizabeth

Thomas who was able to see the accident occur on surveillance footage and was able to see Plaintiff's facial expression about which she commented to Plaintiff;

e)      Defendants refused to allow Plaintiff (on March 15, 2015) to perform approved light duty work, forced him onto unpaid FMLA leave until he was at 100%, and had him escorted out of the  workplace; and

f)      Defendants wrongful denial of the Workers' Compensation claim, and the involvement of Defendants in trying to prevent Plaintiff from receiving TANF (Temporary Aid to Needy Families) and Medicaid when he was on unpaid leave and when Defendants had cancelled his employee medical coverage.

128.    There was inappropriate conduct by Defendants on multiple occasions including the following:

a)      Defendants sending the three sets of letters to Plaintiff during the forced unpaid FMLA leave, where if Plaintiff did not respond within a short period of time, his employment would have been terminated;

b)      Defendants' interviewing individuals for Plaintiff's job position of Membership Team Lead, during the first 12 weeks of  Plaintiff's unpaid forced FMLA, where his job was supposed to be held for him during that time frame.

c)      The November 11, 2013 interrogation of Plaintiff by Scott Stiverson and MHRM Kirsten Willis, without Plaintiff having his attorney present, about his attorney's strategies regarding his Workers' Compensation claim and his EEOC claims;

d)      Defendants defaming Plaintiff by calling him "a liar", "a fraud", "litigious", "faking it", and telling him his concerns were "costing the company money";

e)      Defendants in their annual evaluations of Plaintiff, after Plaintiff had whistle blown on Defendants and had filed EEOC Charge No. 541-2015-01774 and Charge No. 541-2013-01272, failed to acknowledge the work Plaintiff was doing, gave him inappropriate evaluation marks, wrongfully blamed Plaintiff for actions of others, and failed to acknowledge that he was continuously meeting and exceeding goals; and

f)      Defendants' continuous overlooking of Plaintiff for promotion.

129.    Additionally, there were the discriminatory actions related to religion and race and the failure of Defendants to abide by their corporate procedures and policies, as detailed in prior paragraphs of this Complaint.

130.    Defendants, in breach of their above-stated assurances, including the violation of Defendants' ethical duties and its obligations of good faith and fair dealing, wrongfully denied Plaintiff's WC claim, forced him onto an unpaid FMLA leave of absence, discriminated against him on the bases of race, religion, age, and ADA, and retaliated against Plaintiff for his whistle blowing and standing up for his state and federally protected rights.

131.    This was arbitrary and capricious and in direct violation of Defendants' ethical duties and their obligations of good faith and fair dealing.

132.    Defendants acted intentionally, willfully, wantonly, and recklessly in breaching its obligations to Plaintiff and in discriminating against of Plaintiff.

133.   These actions created material employment disadvantages to Plaintiff including, but not limited to the loss of income and benefits; lack of bonuses and raises; created a hostile work place; caused extreme mental distress; affected the terms and conditions of Plaintiff's employment, and otherwise adversely affected his status as an employee.

134.   Defendants knew directly of these offensive acts and the impact these acts were having on the mental and physical health of Plaintiff.  The Defendants failed to assist and/or attempt to rectify the discrimination, differential treatment and hostile employment environment to which the Plaintiff was being subjected, causing him to suffer extreme distress, mental health issues and physical issues.

135.   As a direct and proximate result of the Defendants' actions, Plaintiff lost promotion opportunities, and suffered and continues to suffer other economic damages.  As a result Plaintiff suffered and continues to suffer non-economic losses and damages including aggravated health problems, mental anguish, emotional distress, loss of relationships, loss of consortium, loss of enjoyment of life, embarrassment, shame, humiliation, and other personal suffering.  As a further result Plaintiff has suffered and continues to suffer from aggravated physical disability.

136.   Plaintiff is entitled to recover from Defendants for his economic and non-economic losses, including damages based upon willful violation of the law by Defendants.

## <u>Count IX. Defamation</u>

137.   Plaintiff adopts and incorporates the allegations set forth in paragraphs 1 through 136 of this Complaint as if fully set forth below.

138.   Defendants have defamed Plaintiff by using inappropriate language regarding Plaintiff's religious observation, national origin and his Workmen's Compensation claims, which is slanderous, embarrassing, inflammatory, derogatory, and demeaning and inflicted stigma on Plaintiff's reputation.

139.   This defamation occurred both in the Club where Plaintiff works and other Clubs and outside his workplace.  It also occurred with store customers where the various individuals heard disparaging comments about Plaintiff's veracity. Defendants told management, associates and customers that Plaintiff was a "fraud" and a "liar", "litigious" and that he had faked his Workmen's Compensation injuries.

140.   The slanderous language and defamatory actions have routinely kept the Plaintiff from moving up the corporate ladder; receiving requested transfers, vacations, and bereavement leave among other things.

141.   These actions were extreme, reckless and outrageous.

142.   These actions were intentional.

143.    The actions were intentional and committed with malice or reckless disregard and indifference to Plaintiff and his rights under state and federal law and created a hostile work place, caused extreme mental distress, affected the terms and conditions of Plaintiff's employment, and otherwise adversely affected his status as an employee.

144.    Defendants knew directly of these offensive acts and the impact these acts were having on the mental and physical health of Plaintiff.  The Defendants failed to assist and/or attempt to rectify the discrimination, differential treatment and hostile employment environment to which the Plaintiff was being subjected, causing him to suffer extreme distress, mental health issues and physical issues.

145.    As a result of Defendants' conduct, Plaintiff sustained emotional distress and mental suffering as well as injury to his reputation and professional standing among his peers and potential employers/supervisors.

146.    Plaintiff is entitled to recover from Defendants for his economic and non-economic losses, including damages based upon Defendants' willful actions.

## Count X. Intentional Infliction of Emotional Distress

147.    Plaintiff adopts and incorporates the allegations set forth in paragraphs 1 through 146 of this Complaint as if fully set forth below.

148.    At all times material, Defendants harassed, intimidated or subjected Plaintiff to discrimination or failed to protect Defendant from harassment, intimidation, and discrimination.

149.    The comments, actions, and inactions of Defendants and their agents were extreme and outrageous and done to further Defendants' agenda without any regard for Plaintiff.

150.    Defendants denial of Plaintiff's valid Workers' Compensation case, his being put on a forced FMLA leave without pay or benefits, his not being allowed to return to work until he was 100% were done, his being escorted off the property at the time Defendants wrongfully denied the Workers' Compensation case, , the denial of bereavement benefits for his family member, the denial of vacation requested three months in advance, and as well as the regular racial and religious decimation to which Plaintiff was subjected was done without any regard for the effect these actions would have on Plaintiff.

151.    The actions were done with the intent of causing extreme emotional distress to Plaintiff, or done in reckless callous disregard to the emotional distress being caused to Plaintiff.

152.    The actions were intentional and committed with malice or reckless disregard and indifference to Plaintiff and his rights under state and federal law.

153.    The conduct of Defendants and the failure of the Defendants to provide any relief or assistance to Plaintiff severely altered Plaintiff's employment circumstances and created a hostile employment environment.

154.    The conduct of Defendants and their failure to alleviate, assist, or attempt to rectify the discrimination, differential treatment and hostile employment environment to which Plaintiff was subjected was sufficiently severe or pervasive to create a hostile work environment causing Plaintiff to suffer emotional distress, mental health issues, and serious physical issues.

155.    As a direct and proximate result of Defendants unlawful treatment of Plaintiff, Plaintiff has suffered significant injury and damages.  Plaintiff lost promotion opportunities, and suffered and continues to suffer other economic damages.  As a result Plaintiff suffered and continues to suffer non-economic losses and damages including aggravated health problems, mental anguish, emotional distress, loss of relationships, loss of consortium, loss of enjoyment of life, embarrassment, shame, humiliation, and other personal suffering.  As a further result Plaintiff has suffered and continues to suffer from aggravated physical disability.

156.    Plaintiff is entitled to recover from Defendants for his economic and non-economic losses, including damages based upon willful violation of the law by Defendants.

## **RELIEF SOUGHT**

Wherefore, Plaintiff respectfully prays for judgment in his favor and against Defendants as follows:

I. For Defendants to make Plaintiff whole by providing compensation for past, present, and future pecuniary losses resulting from the unlawful practices complained of above, including without limitation:
   a. economic losses for past, present, and future income and benefits that Plaintiff would have received had he been promoted;
   b. loss of 401k matched contributions from management salary positions that Plaintiff would have received had he been promoted; and
   c. loss of difference in retirement income of an associate position wage verses what Plaintiff would have in future retirement income had he been promoted;

II. For Defendants to make Plaintiff whole by providing compensation for past and future nonpecuniary losses resulting from the unlawful practices complained of above, including without limitation:
   a. damage to reputation;
   b. loss of résumé value of management positions which would have assisted Plaintiff in further promotions within the company or in obtaining employment outside of the company; and
   c. loss of professional and career opportunities;
   d. mental anguish;
   e. emotional distress;

f.   loss of enjoyment of life; and

g.   other suffering;

III.   All aggravated physical and mental health impairment;

IV.   All available punitive and liquidated damages;

V.   All related and applicable consequential and incidental damages;

VI.   Prejudgment and post-judgment interest as provided by law;

VII.   All costs, expenses, and reasonable attorney's fees as allowed by law, including witness expenses, expert witness fees and travel expenses; and

VIII.   Such other legal and equitable relief as the Court deems just and appropriate.

## JURY TRIAL DEMAND

Plaintiff demands a trial before a jury on all issues.

Respectfully submitted,

/s/ Amy Jane Simons

_____
Law Offices of Amy Jane Simons, LLC
Attorney for Plaintiff Joseph E. Gomez III
10940 S. Parker Road, Suite 700
Parker, Colorado  80134
303-220-1320 Office
303-220-1560 Fax
Amy@amyjanesimons.com

Plaintiff's Address:
1830 Newland Court, #200
Lakewood, Colorado  80214

DATED this 5th day of September 2016